# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **WAYLON SHANE HICKS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:17cv00046 |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | BY: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

### *I. Background and Standard of Review*

Plaintiff, Waylon Shane Hicks, ("Hicks"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hicks protectively filed an application for DIB on October 1, 2013, alleging disability as of April 6, 2013, based on major depressive affective disorder; generalized anxiety disorder; and specific phobias. (Record, ("R."), at 11, 172-73, 191.) The claim was denied initially and upon reconsideration. (R. at 94-96, 99-102, 104-06.) Hicks then requested a hearing before an administrative law judge, ("ALJ"). (R. at 107-08.) A hearing was held on July 28, 2016, at which Hicks was represented by counsel. (R. at 34-65.)

By decision dated August 31, 2016, the ALJ denied Hicks's claim. (R. at 11-21.) The ALJ found that Hicks met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 13.) The ALJ found that Hicks had not engaged in substantial gainful activity since April 6, 2013, the alleged onset date.[1] (R. at 13.) The ALJ found that the medical evidence established that Hicks had severe impairments, namely post-traumatic stress disorder, ("PTSD"); major depressive disorder; and obsessive-compulsive disorder, ("OCD"), but he found that Hicks did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found that Hicks had the residual functional capacity to perform a full range of work at all exertional levels, but he was limited to performing simple, routine tasks consisting of no more than four steps; work that did not require interaction with the public; that required

---

[1] Therefore, Hicks must show that he was disabled between April 6, 2013, the alleged onset date, and August 31, 2016, the date of the ALJ's decision, in order to be eligible for benefits.

no more than occasional interaction with co-workers and supervisors; that was limited to only a few day-to-day changes; and that did not require fast production rate pace or maintaining strict daily production quotas. (R. at 15.) The ALJ found that Hicks could not perform any of his past relevant work. (R. at 20.) Based on Hicks's age, education, work experience, and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Hicks could perform, including jobs as a cleaner, a groundskeeper and a laundry worker. (R. at 20-21.) Thus, the ALJ concluded that Hicks was not under a disability, as defined in the Social Security Act, and was not eligible for disability insurance benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520(g) (2018).

After the ALJ issued his decision, Hicks pursued his administrative appeals, (R. at 170, 238-39), but the Appeals Council denied his request for a review. (R. at 1-6.) Hicks then filed this action seeking review of the ALJ's unfavorable decision which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2018). This case is before this court on Hicks's motion for summary judgment filed March 9, 2018, and the Commissioner's motion for summary judgment filed April 12, 2018.

## II. Facts[2]

Hicks was born in 1973, (R. at 39, 172), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Hicks has a high school education and past

---

[2] Hicks's only dispute is with respect to the ALJ's assessment of his mental limitations. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11-18.) Therefore, the court will address the facts relevant to Hicks's mental health.

work experience as a corrections sergeant[3] and officer at a maximum security prison. (R. at 38-40, 192.) While working at the prison, Hicks witnessed a close friend and fellow guard suffer multiple stab wounds to his chest, back and eye. (R. at 44-45.) Being the first to respond, Hicks saved his friend's life and disarmed the inmate. (R. at 44-45.) He stated that he considered hurting himself so that he did not have to return to work. (R. at 45-46.) He stated that he participated in counseling in 2006, 2008 and 2010.[4] (R. at 44.) Hicks stated that he drove his daughter to school; drove his wife places;[5] mowed the lawn; helped his daughter with homework; communicated with family members on Facebook; and occasionally attended family gatherings. (R. at 49, 55-59.) He stated that, as a result of his training, he was constantly and consistently looking out for potential threats. (R. at 49-50.)

Robert Jackson, a vocational expert, testified at Hicks's hearing. (R. at 61-64.) Jackson was asked to consider a hypothetical individual of Hicks's age, education and work history, who had no exertional limitations; who would be limited to performing simple, routine tasks of up to four steps; who could not have any interaction with the public; who could have only occasional interaction with supervisors and co-workers; and who could perform in a work environment with few day-to-day changes. (R. at 62.) Jackson stated that the hypothetical individual could not perform Hicks's past work; however, he stated that the individual could perform work that existed in significant numbers, including jobs as a cleaner, a

---

[3] Hicks testified that he worked as a sergeant for four months before leaving work on short-term disability. (R. at 42.)

[4] The record does not contain records from these time periods.

[5] Despite testifying that he drove his daughter and wife everywhere, when asked what things he did to deal with his symptoms, other than take medications, Hicks stated that he avoided leaving his home. (R. at 48, 58.)

groundskeeper and a laundry worker. (R. at 62-63.)

Jackson was asked to consider a second hypothetical individual with the same limitations as previously described, but who could not perform in a work environment that required fast production rate pace or maintaining strict daily production quotas. (R. at 63.) Jackson stated that the individual could perform the previously mentioned jobs. (R. at 63.) Jackson was then asked to consider a third hypothetical individual who would be limited to performing simple, routine tasks of up to four steps; who could not interact with the public, co-workers or supervisors; and who required a work environment with only a few day-to-day changes that did not require fast production rate pace or maintaining strict production quotas. (R. at 63-64.) Jackson stated that there would be no jobs available that such an individual could perform. (R. at 64.)

In rendering his decision, the ALJ also reviewed records from Dr. R. Scott Macdonald, M.D., a neurologist; Dr. Ronald S. Smith, M.D.; Anne B. Jacobe, L.C.S.W., a licensed clinical social worker; Lee County Behavioral Health Services; Deidra Fisher Taylor, L.C.S.W., a licensed clinical social worker; Leslie E. Montgomery, Ph.D., a state agency psychologist; Stonsa N. Insinna, Ph.D., a state agency psychologist; and Mary Alice Fields, L.P.C., a licensed professional counselor.

On April 8, 2013, Hicks saw Anne B. Jacobe, L.C.S.W., a licensed clinical social worker, for feeling a "sense of impending doom" and difficulty making himself go back to work. (R. at 263.) Jacobe reported that Hicks had a mixed mood; anxious affect; intact orientation and thought process; and fair judgment and

insight. (R. at 263.) She diagnosed specific phobia[6] and anxiety and assessed Hicks's then-current Global Assessment of Functioning, ("GAF"),[7] score at 60,[8] with his highest GAF score being 65 within the past year.[9] (R. at 263.) Jacobe recommended that Hicks be off work for two weeks. (R. at 263.) Hicks saw Jacobe throughout 2013 and reported depression; anxiety; irritability; auditory delusions; nightmares and difficulty concentrating. (R. at 259, 264, 458-59, 464, 466.) During this time, Jacobe noted that Hicks had a depressed mood; anxious affect; intact orientation; auditory delusions; and fair judgment and insight. (R. at 259, 264, 455, 458-59, 465-66.) Hicks's thought process was described as rambling, racing and slowed. (R. at 259, 264, 455, 458-59, 465-66.)

On April 17, 2013, Hicks saw Dr. Ronald S. Smith, M.D., for complaints of panic attacks, sleep impairment and anxiety.[10] (R. at 316.) Hicks stated that he had a "sense of impending doom," that he was having problems with his work

---

[6] Specific phobia is a marked and persistent fear that is excessive or unreasonable, cued by the presence or anticipation of a specific object or situation. Exposure to the phobic stimulus almost invariably provokes an immediate anxiety response, which may take the form of a situationally bound or situationally predisposed panic attack *See* https://behavenet.com/diagnostic-criteria-30029-specific-phobia (last visited Mar. 28, 2019).

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

[9] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

[10] Dr. Smith saw Hicks throughout 2013 for sleep impairment; auditory hallucinations; panic attacks; nightmares; anxiety; and irritability. (R. at 243-44, 289, 291, 293, 295, 297, 302, 310, 316, 325.) Dr. Smith diagnosed generalized anxiety disorder with phobia; major depression; atypical hallucinations; panic; and nightmare disorder. (R. at 243-44, 289, 291, 293, 295, 297, 302, 310, 313, 325.) He assessed Hicks's GAF score between 55 and 60. (R. at 243-44, 289, 291, 293, 295, 297, 302, 305, 313, 325.)

environment and that he attempted to avoid interacting with the public. (R. at 316.) Dr. Smith diagnosed panic attacks; generalized anxiety disorder with phobia; and major depression. (R. at 313.) He assessed Hicks's then-current GAF score at 60. (R. at 313.)

On May 17, 2013, Jacobe completed an insurance form, advising that Hicks could return to work on June 17, 2013. (R. at 253.) She cited Hicks's reduced focus and concentration and increased irritability as symptoms that impaired his ability to work. (R. at 252.) On June 11, 2013, Dr. Smith reported that Hicks was not ready to return to work. (R. at 305.) On July 11, 2013, Jacobe completed an insurance form, advising that Hicks should stay out of work beyond June 11, 2013. (R. at 248.) She cited Hicks's racing thoughts, anxiety and auditory hallucinations as symptoms that impaired his ability to work. (R. at 248.) Jacobe stated that it was "undetermined" when Hicks could return to work. (R. at 249.) On July 12, 2013, Hicks reported that his auditory hallucinations had decreased. (R. at 297.) Dr. Smith diagnosed panic attacks; generalized anxiety disorder with phobia; and major depressive disorder. (R. at 297.) He assessed Hicks's then-current GAF score at 60. (R. at 297.)

On July 23, 2013, Dr. R. Scott Macdonald, M.D., a neurologist, saw Hicks at Dr. Smith's request for evaluation of an abnormal brain MRI. (R. at 240-41.) Hicks reported that his auditory hallucinations were controlled with medications. (R. at 240.) Dr. Macdonald reported that Hicks was alert, oriented and cooperative; he had intact memory; he had an appropriate affect; and he expressed no hallucinations. (R. at 240.) Hicks's neurological examination was normal with the exception of bilateral hearing loss. (R. at 241.) A review of Hicks's brain MRI showed nonspecific unidentified bright objects, ("UBOs"); however, Dr.

Macdonald did not suspect a demyelinating disorder, such as multiple sclerosis. (R. at 241-42.)

In September, October and November 2013, Hicks continued to report "weird dreams," and hearing hissing in his ears, but he denied hearing voices. (R. at 275-76, 289, 449-50.) In November 2013, Hicks told Dr. Smith that he was looking for work. (R. at 289.) Dr. Smith assessed Hicks's then-current GAF score at 60. (R. at 289.)

On November 26, 2013, Dr. Smith completed a mental work capacity evaluation, indicating that Hicks was diagnosed with panic attacks, generalized anxiety, major depression and a nightmare disorder. (R. at 320-24.) He assessed Hicks's then-current GAF score between 55 and 60. (R. at 320.) Dr. Smith opined that Hicks had no limitations in his ability to understand and remember very short and simple instructions; to follow work rules; to ask simple questions or request assistance; to demonstrate reliability; to maintain personal appearance and basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public transportation. (R. at 321-23.) He opined that Hicks had a slight limitation in his ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out very short and simple instructions; to maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without supervision; to make simple work-related decisions; to perform at a consistent pace without an unreasonable number of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; to

respond appropriately to usual work situations and to changes in a routine work setting; and to set realistic goals or make plans independently of others. (R. 321-23.)

Dr. Smith found that Hicks had a satisfactory ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain work activities within a full-time work schedule; to function independently; and to work in coordination with or in proximity to others without being distracted by them. (R. at 321-23.) He found that Hicks had a seriously limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to interact appropriately with the general public. (R. at 321-22.) He found that Hicks could not sustain any work activity for five days a week, eight hours a day, 52 weeks a year because his "anxiety may interfere on occasion." (R. at 323.)

Throughout 2014, Hicks continued treating with Dr. Smith and Jacobe for complaints of anxiety; nightmares; guilt; anger; isolation; lack of motivation; low energy; difficulty concentrating; and flashbacks. (R. at 422-33, 441-47.) During this time, Jacobe noted that Hicks had a depressed and irritable mood; anxious affect; intact orientation; intact and racing thought process; he had no paranoia or delusions; and he had fair judgment. (R. at 441, 446.) Dr. Smith noted that Hicks had poor eye contact; appropriate and constricted affect; anxious and depressed mood; intact sensation and memory; unremarkable thought content; linear and nonlinear thought process; and impaired judgment. (R. at 424, 426, 428, 430, 432.)

On February 20, 2014, Leslie E. Montgomery, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding

that Hicks had mild limitations in his activities of daily living; experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 70-71.)

That same day, Montgomery completed a mental assessment, indicating that Hicks had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (R. at 72-74.) Montgomery noted that Hicks was capable of understanding and following simple one-to-two step instructions; to maintain concentration for two-hour periods with normal breaks; to perform work with limited social contact; and to perform simple, unskilled work. (R. at 72-74.) Montgomery stated that Hicks's work-related mental abilities were, otherwise, not significantly limited. (R. at 72-74.)

On May 19, 2014, Jacobe completed a psychiatric assessment form, indicating that Hicks was diagnosed with generalized anxiety disorder and major depressive disorder. (R. at 350-55.) She noted that Hicks's condition had improved since the initial evaluation. (R. at 350.) Jacobe opined that Hicks was unable to relate to others in a work setting; to respond appropriately to supervision; and to supervise or manage others. (R. at 352.) She did not anticipate Hicks returning to work in his prior occupation, and she opined that he would not benefit from vocational rehabilitation services. (R. at 354-55.)

In July 2014, Hicks began counseling at Lee County Behavioral Health Services. (R. at 358.) Hicks reported difficulty in dealing with the public and life in general. (R. at 358.) Deidra Fisher Taylor, L.C.S.W., a licensed clinical social worker, reported that Hicks had a clean and casual appearance, he made fair eye contact, and he had a congruent mood and affect.[11] (R. at 358.)

On August 18, 2014, Stonsa N. Insinna, Ph.D., a state agency psychologist, completed a PRTF, finding that Hicks had mild limitations in his activities of daily living; experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 84-85.)

That same day, Insinna completed a mental assessment, indicating that Hicks had moderate limitations in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to be aware of normal hazards and take appropriate precautions. (R. at 86-88.) Insinna noted that Hicks was capable of performing simple, routine work tasks in an environment

---

[11] Taylor saw Hicks throughout 2014 for reported flashbacks; difficulty dealing with life issues; OCD; profiling; PTSD; difficulty sleeping; and depression. (R. at 359-72.) Taylor consistently reported that Hicks had a clean and casual appearance, he made fair to good eye contact; and he had a congruent mood and affect. (R. at 359-72.)

with limited stressors, infrequent change and minimal social contact. (R. at 87-88.) Insinna stated that Hicks's mental work-related abilities were, otherwise, not significantly limited. (R. at 87-88.)

On August 20, 2014, Hicks reported that his nightmares had decreased with medication, but that he was not sleeping well. (R. at 426.) On September 30, 2014, Hicks reported that he did not leave the house. (R. at 424.) He denied delusions and hallucinations. (R. at 424.) On December 1, 2014, Hicks reported that he was attempting to get out of the house more. (R. at 422.) He stated that his medication has decreased his nightmares. (R. at 422.)

On October 14, 2014, Hicks reported that he attended his daughter's fall festival and had a rough time. (R. at 365.) On October 23, 2014, Hicks reported that he went to the zoo with his family. (R. at 366.) He stated that he went to Walmart and "lost it," causing him to leave abruptly. (R. at 366.) On November 24, 2014, Hicks reported that he went to his daughter's Thanksgiving party and to a Christmas parade. (R. at 369.)

In January 2015, Dr. Smith observed that, despite monotone speech and poor eye contact, Hicks expressed interests in his hobbies.[12] (R. at 420.) On March 3, 2015, Hicks reported that he had periods of increased interest or motivation. (R. at 418.) He stated that he had some days of improvement. (R. at 418.) On March 26, 2015, Hicks had a moderately anxious mood, a mood-congruent affect, and he was cooperative and communicative, with appropriate eye contact. (R. at 377.) On March 30, 2015, Hicks reported that medication was helping his symptoms. (R. at

---

[12] Dr. Smith noted that Hicks had poor eye contact; appropriate and constricted affect; anxious and depressed mood; intact sensation and memory; unremarkable thought content; linear and nonlinear thought process; and impaired judgment. (R. at 401-21.)

416.) Hicks reported that he had an increased interest in woodworking. (R. at 416.)
Dr. Smith reported that Hicks had a constricted affect; anxious and depressed
mood; intact sensation and memory; linear thought process; and impaired
judgment. (R. at 416.)

On April 1, 2015, Mary Alice Fields, L.P.C., a licensed professional
counselor, saw Hicks who reported feeling uncomfortable during a discussion
about guns with his sister and brother-in-law when they visited, and he reported
discomfort in crowds and hypervigilance.[13] (R. at 378.) Hicks stated that he wished
he could work, but he "cannot stand to be around people." (R. at 378.) Fields noted
that Hicks had a moderately depressed mood; congruent affect; unremarkable dress
and grooming; he was cooperative and communicative; and had appropriate eye
contact. (R. at 378.) In April 2015, Dr. Smith also reported that Hicks went to an
emergency room for panic symptoms resembling a heart attack. (R. at 414.) Dr.
Smith assessed Hicks's then-current GAF score at 70.[14] (R. at 414.)

On June 3, 2015, Hicks reported that he was having a good day. (R. at 382.)
He stated that he helped clean out his grandparents' home and had a trip to Florida
planned to house sit for a family member. (R. at 382.) On June 25, 2015, Hicks
reported feeling down and having little interest. (R. at 413.) He reported a "few
episodes" of panic. (R. at 413.) Dr. Smith reported that Hicks had a constricted

---

[13] Throughout 2015, Fields saw Hicks for his complaints of intrusive thoughts;
nightmares; anxiety; difficulty being around people; PTSD; and hypervigilance. (R. at 377-83,
385-86, 388-89, 391, 393.) Fields repeatedly reported that Hicks had a congruent affect; his
grooming and dress were unremarkable; he was cooperative and communicative; and he had
appropriate eye contact. (R. at 377-83, 385-86, 388-89, 391, 393.) Hicks's mood was described
as calm; slightly and moderately anxious; euthymic; and moderately depressed. (R. at 377-83,
385-86, 388-89, 391, 393.)

[14] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in
social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV
at 32.

affect; anxious and depressed mood; intact sensation and memory; and nonlinear thought process. (R. at 413.) On July 29, 2015, Hicks reported anxiety and depression. (R. at 385.) He stated that he would like to explore a career in research, such as working for an attorney researching deeds or mineral rights, but did not know how he could perform the job in his present state of mind. (R. at 385.)

In August 2015, Hicks reported that his mood had improved. (R. at 410.) He stated that he was interested in finding a new career, but was unsure if he could hold down a job. (R. at 386.) He continued to be hypervigilant and was extremely anxious around crowds. (R. at 386.) On October 15, 2015, Hicks reported continued symptoms of anxiety and PTSD. (R. at 389.) He recently accompanied his daughter to Girl Scouts as a chaperone. (R. at 389.) On December 22, 2015, Hicks reported anxiety while being in crowds. (R. at 403.) He stated that he had more interest in doing things. (R. at 403.)

On January 25, 2016, Hicks reported that his nightmares had increased, and he reported social anxiety. (R. at 401.) He reported that his medication had helped. (R. at 401.) On February 15 and 19, 2016, Taylor stated that Hicks continued to have difficulty dealing with PTSD symptoms and with hypervigilance.[15] (R. at 486-87.) Taylor diagnosed PTSD and panic disorder with agoraphobia. (R. at 486-87.) She assessed Hicks's then-current GAF score at 56. (R. at 486-87.) On March 21, 2016, Hicks reported that medication decreased the intensity of his dreams, but that he had problems staying asleep. (R. at 438.) He stated that his depression "wax and wanes." (R. at 438.) On May 18, 2016, Hicks reported that he was doing

---

[15] Throughout 2016, Taylor saw Hicks for his complaints of difficulty with PTSD; flashbacks; nightmares; hypervigilance; and scanning and profiling people. (R. at 486-98.) Over this time, she assessed his GAF score from 50 to 56. (R. at 486-98.) A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning…." DSM IV at 32.

"pretty good" with his medications leveling out. (R. at 484.) He complained of having nightmares about the prison. (R. at 484.)

On May 18, 2016, Dr. Smith completed a mental work capacity evaluation, stating that Hicks was diagnosed with major depression, recurrent; generalized anxiety with panic; social anxiety; and nightmare disorder. (R. at 478-81.) He assessed Hicks's then-current GAF score at 60 with his highest GAF score being 60 in the previous year. (R. at 478.) Dr. Smith opined that Hicks had no limitation on his ability to remember locations and work-like procedures. (R. at 479.) He found that Hicks had a slight limitation in his ability to understand, remember and carry out short and simple instructions; to follow work rules; to demonstrate reliability; and to maintain personal appearance and basic standards of neatness and cleanliness. (R. at 479-80.) Dr. Smith reported that Hicks had a satisfactory ability to understand, remember and carry out detailed instructions; to sustain an ordinary routine without special supervision; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; to be aware of normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public transportation. (R. at 479-80.)

Dr. Smith also found that Hicks had a seriously limited ability to maintain attention and concentration for an extended period (two hours); to function independently; to make simple work-related decisions; to perform at a consistent pace without an unreasonable number of rest periods; to work in coordination with or in proximity to others without being distracted by them; and to set realistic goals

or make plans independently of others. (R. at 479-80.) Dr. Smith opined that Hicks had no useful ability to sustain work activities within a full-time work schedule; to maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 479-80.)

On May 31, 2016, Taylor noted that Hicks's agoraphobia was increasing. (R. at 496.) She assessed Hicks's then-current GAF score at 56. (R. at 496.) On June 20, 2016, Hicks reported that he went to a water park in Kentucky and out of 1,500 people there, he found a convicted child molester taking pictures. (R. at 497.) On July 5, 2016, Hicks reported that he visited his sister in Kentucky. (R. at 498.) He stated that he had good moments, but decided that his comfort zone was his home. (R. at 498.) He noted an increase in PTSD symptoms. (R. at 498.) Taylor diagnosed PTSD; panic disorder with agoraphobia; and attention deficit disorder. (R. at 498.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2018). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review

does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & 2018 Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Hicks argues that the ALJ erred by improperly determining his mental residual functional capacity by failing to properly evaluate the opinions of his treating mental health care providers, Dr. Smith and Jacobe. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11-18.) The ALJ found that Hicks suffered from severe impairments, including PTSD, major

depressive disorder and OCD. (R. at 13-14.) A severe impairment significantly limits a claimant's ability to do basic work activity. *See* 20 C.F.R. § 404.1522(a) (2018). Based on Hicks's mental impairments, the ALJ found that he had the residual functional capacity to perform simple, routine tasks consisting of no more than four steps; work that required no interaction with the public; that required no more than occasional interaction with co-workers and supervisors; that was limited to only a few day-to-day changes; and that did not require fast production rate pace or maintaining strict daily production quotas. (R. at 15.)

Hicks argues that "the ALJ failed to reference persuasive contradictory evidence and provide 'good reasons' for rejecting" the opinions of his treating mental health care providers, Dr. Smith and Jacobe. (Plaintiff's Brief at 16.) Based on my review of the record, I find this argument unpersuasive. While the ALJ, in general, is required to give more weight to opinion evidence from treating medical sources versus nontreating medical sources, the ALJ is not required to give controlling weight to the opinions of a treating physician. *See* 20 C.F.R. § 404.1527(c) (2018). An opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

The ALJ stated that he was giving Jacobe's opinions "limited weight" because she was not an acceptable medical source under the regulations. *See* 20 C.F.R. § 404.1513(a) (2016). (licensed clinical social workers are not acceptable medical sources).[16] (R. at 19.) The ALJ also noted that, while Jacobe's opinion that Hicks cannot manage or supervise others was consistent with the record, neither

---

[16] This was the regulation in effect at the time of the ALJ's decision.

her counseling notes nor other treatment notes indicated that Hicks was unable to relate to others in any work setting or respond appropriately to supervision. (R. at 19.)

The ALJ stated that he was giving Dr. Smith's opinions "limited weight." (R. at 19.) The ALJ noted that Dr. Smith's 2013 opinion was consistent with the record except with respect to Hicks's inability to complete a regular workday or week, which was inconsistent with the record. (R. at 19, 320-24.) In 2013, Dr. Smith's reasoning for Hicks's inability to complete a regular workday or week is that "anxiety may interfere on occasion." (R. at 323.) In 2016, Dr. Smith noted the reasoning for Hicks's inability to complete a regular workday or week as Hicks's depression, low motivation, poor concentration and low energy level. (R. at 481.) As noted by the ALJ, Dr. Smith's 2016 opinion was significantly more limiting than his 2013 opinion, although treatment notes do not document significant worsening in Hicks's condition. (R. at 19, 320-24, 478-81.) The record shows that Hicks's auditory hallucinations were controlled with medication; his sleep and mood improved with medication; his nightmares decreased with medication; and Hicks reported doing "pretty good" with his medications leveling out. (R. at 48, 240, 410, 416, 422, 426, 438, 457, 484.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In addition, Hicks reported that he was getting out more,[17] and he expressed an interest in hobbies. (R. at 365-66, 369, 382, 389, 416, 420, 422, 497-98.) He testified that he piddled with "woodwork and stuff" and that his brother would visit and help him with what he was working on. (R. at 56-58.)

---

[17] Hicks reported that he attended his daughter's fall festival, Girl Scouts meeting and Thanksgiving party. (R. at 365, 369, 389.) He also stated that he attended a Christmas parade; visited a zoo and water park; visited his sister in Kentucky; and planned a trip to Florida to house sit for a family member. (R. at 366, 369, 382, 497-98.)

Hicks also reported that he got along well with authority figures and that he had never been fired or laid off due to problems getting along with others (R. at 204.)

The ALJ stated that he was giving the state agency psychologists "significant weight" because their opinions were consistent with the treatment notes contained in the record. (R. at 18.) An ALJ may rely upon the opinion of a state agency physician. *See* 20 C.F.R. § 404.1527(e)(2)(i) (2016)[18] ("State agency medical and psychological consultants ... are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants ... as opinion evidence, except for the ultimate determination about whether you are disabled."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians"); S.S.R. 96–6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2013 Supp.). ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

State agency psychologist Montgomery found that Hicks was capable of performing simple, unskilled work limited to one-to-two step instructions and that required limited social contact. (R. at 73-74.) State agency psychologist Insinna found that Hicks was capable of performing simple, routine work in an environment with limited stressors, infrequent change and minimal social contact.

---

[18] This is the regulation that was in effect at the time of the ALJ's decision.

(R. at 87-88.) Insinna noted that, "[a] large part of [Hicks's] anxiety relates to the belief that he has to return to the same work setting, thus, through association, his anxiety increases." (R. at 88.) Based on this, I find that substantial evidence exists to support the ALJ's weighing of the evidence with regard to Hicks's mental residual functional capacity.

Based on the above, I find that substantial evidence exists to support the ALJ's finding as to Hicks's mental residual functional capacity. Thus, I find that substantial evidence exists in the record to support the ALJ's finding that Hicks was not disabled. An appropriate Order and Judgment will be entered.

DATED:      March 29, 2019.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE